UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| QUINCY ALLEN | CIVIL ACTION |
| VERSUS | NO: 11-1156 |
| AEP RIVER OPERATIONS, LLC, ET AL. | SECTION: "A" (5) |

### FINDING OF FACT AND CONCLUSIONS OF LAW

This is an action brought by plaintiff Quincy Allen pursuant to general maritime law against AEP River Operations, LLC. Plaintiff alleges that on November 30, 2008, he was injured while working with an AEP employee to uncouple two barges. Defendant disputes that its employee was at fault in causing the incident, and further disputes that all of Plaintiff's injuries are causally-related to the November 30, 2008 incident.

The case was tried to the Court sitting without a jury on April 15-18, 2013. The matter was taken under advisement on May 14, 2013, upon receipt of the parties' post-trial briefs. Having considered the testimony and evidence at trial, the depositions submitted in lieu of live testimony, the arguments of counsel, and applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

### I.     FINDINGS OF FACT

*Liability*

At all times pertinent, plaintiff Quincy Allen was employed by American River Transportation Co. ("ARTCO") as a lead mate aboard the M/V SCARLETT GEM, a vessel

1

operated by ARTCO. Allen began working with ARTCO in 1996. Allen rose from a deckhand to the supervisory position of lead mate. Allen was well regarded at ARTCO and possessed the knowledge necessary for his position as lead mate. Allen was known to plan out his work and to perform it in a safe manner.

The SCARLET GEM is a towboat that generally operated as a fleet boat in an area known as the Kenner Bend Fleet on the lower Mississippi River. A barge fleet such as the ARTCO Kenner Bend Fleet can generally be described as a "parking lot" for barges where they are retained while they await loading or discharge of cargo and/or placement into tows for transportation along the river. Fleet boats like the SCARLETT GEM operate within the barge fleet, moving barges in and out of larger tows.

On November 30, 2008, the CHARLOTTE ROUSH arrived at ARTCO's Kenner Bend Fleet facility to deliver several barges. Defendant AEP River Operations, LLC was the operator of the CHARLOTTE ROUSH. One of the barges that the CHARLOTTE ROUSH was to deliver was the MEM3058. The MEM3058 had been placed in the CHARLOTTE ROUSH's tow earlier that day at the St. John Fleet, which is not affiliated with AEP or ARTCO. Allen's vessel, the SCARLETT GEM, was dispatched to the CHARLOTTE ROUSH to conduct the routine removal of the MEM3058. The MEM3058 was secured or "coupled" to the MEM2125, another barge in the CHARLOTTE ROUSH's tow.

The 3058 and 2125 were secured to each other at various locations using "stationary wires" that are tightened with the use of a ratchet system. A ratchet is a turnbuckle-like device that is secured to a D-ring affixed to the deck on the bow of the barge, in this case the 2125. The other end of the ratchet contains a pelican hook that opens and closes and to which chain links are attached. The pelican hook has a keeper ring that slides over it when it is closed to keep it in position. The chain links that run from the pelican hook are attached to a 35 foot wire, which runs around the cavel on the barge to which it is affixed (the 2125)

2

forward to the corresponding cavel on the next barge (the 3058). The wire is tightened by using the ratchet, which has a handle that allows one to cinch it as tightly as necessary to provide a secure coupling of the barges. Once the ratchet is tightened the wire is under tension. This is a common arrangement in the barge towing industry.

Each location where a stationary wire and ratchet is used to secure two barges together is known as a "coupling." The coupling between the 3058 and 2125 would have been secured at the St. John Fleet where the 3058 was placed in the CHARLOTTE ROUSH's tow. The evidence does not establish that AEP's personnel coupled the MEM3058 and MEM2125.

On the day of the accident, Allen went to the stern of the 3058 where he met with Nathan Kincaid, a deckhand employed by AEP. Kincaid was there to assist Allen with decoupling the 3058 and the 2125. Before they began the decoupling process, Allen and Kincaid discussed what they were about to do. Allen was the lead man on the job.

Allen positioned himself at the cavel on the 3058. The plan was that Allen would remove the 2125's stationary wire from the 3058's cavel once there was enough slack in the line. Kincaid's job was to put slack in the line and he did so initially by loosening the ratchet. Loosening the ratchet alone did not put enough slack in the line and so Kincaid "kicked loose" or "broke" the coupling by releasing the pelican hook. The wire was kinked, however, which is a condition that cannot be visually detected when the wire is under tension. The kinking results in "wire memory" which can cause the wire to fly about once the tension is released. When Kincaid released the wire from the pelican hook it coiled back and caught Allen's arm thereby injuring his shoulder.

Kinks in wires are a fairly common occurrence in the towing industry. The evidence does not suggest that Kincaid or Allen knew about the kinks before Kincaid released the pelican hook. But Allen was adamant that he had specifically instructed Kincaid to warn him

3

before "kicking loose" the pelican hook should that become necessary. Kincaid could remember very little about the conversation that he had with Allen before they began their task. The Court credits Allen's testimony regarding the discussion that he and Kincaid had before they began the decoupling process, and the understanding between the two men that Kincaid was to warn Allen before fully releasing the tension on the wire. Kincaid appeared to be selectively forgetful when he testified at trial. Kincaid did not warn Allen before opening the pelican hook even though Allen had specifically instructed him to do so, and Allen was injured as a result.

AEP employs a different method for decoupling barges than the method that Allen was using on the day of the accident. AEP never memorialized its method in any type of published safety manual, pamphlet, video, or the like even though it believes its method to be the safer method and the industry standard.[1] No one ever suggested to Allen, who had been working in the industry for many years and who apparently had an excellent work history, that he was using an unacceptable or unsafe method to decouple barges. Allen was not performing his work in an unsafe manner on the day of the accident such that he contributed to his own injuries.

AEP contends that it is impossible to get enough slack in the wire by simply loosening the ratchet, and therefore Allen should have expected that Kincaid would release the pelican hook. But Allen, who again had worked for nearly two decades in the industry and who was an extremely credible witness, was convinced that the wire bite could possibly be removed from the cavel by using the ratchet to introduce enough slack in the line, and apparently he had decoupled barges in this manner in the past. Even if opening the pelican hook was

---

[1] Exhibit 42 is a video depiction of AEP's method of the decoupling process but that video was prepared after Allen's accident to serve as a demonstrative aid at trial. The Court did find this exhibit to be extremely helpful to understanding the process that the witnesses were attempting to describe.

inevitable, it remains that Kincaid was supposed to warn Allen before he released the tension on the wire but he failed to do so.

Again, Kincaid and Allen discussed how they were going to proceed with the task before they began. So regardless of which method AEP generally employed to decouple barges and regardless of whether opening the pelican hook was inevitable at some point, Kincaid was well aware of the decoupling method that Allen was using that day, and Kincaid had been specifically instructed to warn Allen before he released the pelican hook. With full knowledge that Allen was positioned at the cavel on the 3058, Kincaid nonetheless released the pelican hook without warning thereby dropping all tension on the wire which then resulted in Allen's arm getting wrapped in the wire.

Credibility is a crucial aspect of the liability portion of this case. Allen and Kincaid were the only two eye-witnesses to the accident and the discussion that immediately preceded it. The Court carefully observed Allen's demeanor when he testified and while he was present in court during the four days of trial. The Court found Allen to be decent, truthful, and forthcoming. Thus, whatever actuated Allen's reluctance to accuse Kincaid of negligence in the aftermath of the accident, the Court declines to interpret Allen's prior reticence as evidence that he later invented a story in order to cast AEP at fault.

The Court does not find that Kincaid was at fault for failing to stand on the wire when he released it from the pelican hook. Given the tension that the wire was under this would have been inadvisable.

The Court attaches no significance to the fact that AEP did not complete an accident report or attempt to investigate the accident. AEP, who did not employ Allen, might very well have considered the incident to be minor at the time.

In sum, the Court finds Nathan Kincaid to be 100 percent at fault for whatever injuries are causally-related to the November 30, 2008 incident.

### *Medical Causation*

As a result of entangling his arm in the wire, Allen felt discomfort and ultimately returned to the SCARLETT GEM and reported the incident to his captain, David Becnel. Becnel instructed Allen to complete an accident report, which he did. (Exh. 1). Becnel radioed the SCARLETT GEM to ascertain Kincaid's identity so that he could be named on the accident report as a witness. Allen was later removed from the SCARLETT GEM for medical treatment.

Allen initially received medical treatment from Pelican State Outpatient Center. (Exh. 13; 100, 107, 110). The X-ray was negative, and Allen was advised to rest and ice his shoulder, and to return in 3 days for a follow-up visit. Allen returned on December 3, 2008, and the office note indicates that Allen was doing better. (*Id.* at 112, 113, 114). Allen was discharged without restrictions and told to return if needed.

The next entry in the medical records occurred on March 12, 2009, when Allen returned to Pelican complaining of increased pain and trouble abducting after pulling on a wire earlier that week. (Exh. 13; 115, 121). According to the office note, the November 30, 2008, injury had gotten better although it was not 100 percent healed because Allen had still been experiencing a "nagging soreness" at times before the "re-injury." (*Id.* at 115). Dr. Patterson, the treating physician, ordered an MRI and then referred Allen to Dr. Luis Espinoza, an orthopedic surgeon. (*Id.* at 124, 126, 127).

Dr. Espinoza saw Allen for the first time on March 27, 2009, and determined that Allen was a candidate for surgery in light of the MRI results, and his complaints of chronic pain since the original November 30, 2008 accident. Diagnostic arthroscopy would allow Dr. Espinoza to fully inspect the affected area and assess any damage. Dr. Espinoza performed outpatient surgery on Allen's right shoulder on April 23, 2009. During surgery Dr. Espinoza discovered a significant and dramatic superior labral tear within the shoulder joint. The

procedure involved "right shoulder bursectomy, subacromial decompression, distal clavicle resection, and labral debridement." (Exh. 43, 1118). Based on what he saw during the surgery, Dr. Espinoza was very optimistic that Allen would have a good outcome but the right shoulder would be weakened and susceptible to re-injury. Dr. Espinoza prescribed regular physical therapy and permitted Allen to return to light duty work.

The surgery that Dr. Espinoza performed on April 23, 2009, was necessitated by the November 30, 2008 incident. Allen had no history of problems with his right shoulder prior to the November 30, 2008 incident. Allen had continued to experience shoulder pain after the November 30, 2008 incident. Nothing suggests that the wire-pulling referred to in Dr. Patterson's note of March 12, 2009, was a traumatic event of the kind that could cause the type of shoulder injuries that Dr. Espinoza ultimately discovered. Dr. Espinoza was persuaded that the type of injury that Allen had sustained was consistent with the wire incident aboard the MEM3058. Allen did not sustain a new, intervening injury as a result of wire pulling.

Allen returned to work within the restrictions imposed by Dr. Espinoza but Allen continued to experience pain and discomfort in his shoulder. Allen was not able to work at the same level as before the November 30, 2008 incident. The physical requirements of Allen's job were more onerous than the maximum allowable limits of Dr. Espinoza's restrictions. Because Allen was a lead mate, he was able to delegate heavy duty tasks to the deckhands working under him.

In the following months Allen continued to improve with regular physical therapy. As of July 29, 2009, Allen was not fully recovered although he was clearly improving. The physical therapist's report from that date confirms that Allen was continuing to experience pain although it was decreasing, and that Allen could return to his normal work schedule but at a medium level only. (Exh. 43; 1113). On that same day, Allen reported to Dr. Espinoza

that he was doing 75 to 80 percent better. Dr. Espinoza cleared Allen to return to work "full duty [without] restrictions as of 8/3/09." (*Id.* at 1110). But on the next line of the note, Dr. Espinoza specifically restricted Allen to "no lift > 50lbs." (*Id.*). The "Return to work recommendations form" that Dr. Espinoza completed for ARTCO likewise contains a hand-written annotation of "full duty" but Dr. Espinoza checked the box next to the "medium work" restriction ("Lifting 50 pounds maximum with frequent lifting and/or carrying of objects weighing up to 25 pounds."). (*Id.* at 1111). The term "full duty" is not defined anywhere in the notes or forms but clearly the term did not mean "without restrictions" and it did not mean "light heavy work" or "heavy work" because those more permissive restriction options were on the form but Dr. Espinoza did not check those options. Dr. Espinoza did not discharge Allen at this point and instructed him to report for a follow-up visit in 4 weeks.

The follow-up visit with Dr. Espinoza occurred on August 26, 2009. Allen reported that he was feeling about 80 to 85 percent improved following surgery but he did mention to Dr. Espinoza that he had aggravated his right shoulder on August 14, 2009, while swinging a heavy maul at work. (Exh. 43; 1120). Allen had seen the physical therapist on August 17, 2009, which would have been just 3 days after the maul incident, yet there is no mention of the incident in the physical therapist's office note for that day. (*Id.* at 1115).

The maul incident appears to have been reported to Dr. Espinoza during a routine follow-up evaluation. In other words, the office visit after the maul incident was not necessitated by that incident as one would have expected with a new injury.

That Dr. Espinoza did not view the maul incident as any type of new trauma sufficient to have re-injured the shoulder is clear because he discharged Allen following the August 26, 2009 visit. Dr. Espinoza believed that swinging the maul would have been within the work restrictions that he had placed on Allen. As of that date Allen was 4 months post-

8

surgery and while he had returned to work, he had experienced a few episodes of aggravation, including the maul incident. (Exh. 43; 1118). Allen subjectively placed his improvement at the 85 percent level. Dr. Espinoza concluded that Allen was at maximum medical improvement but that Allen was continuing to experience persistent stiffness in his right shoulder that would not likely resolve. Dr. Espinoza quantified Allen's impairment at 10 percent for the upper extremity and 6 percent overall. (*Id.*). Allen was to continue his work activity as tolerated and return to Dr. Espinoza if necessary. Dr. Espinoza stated that if Allen could not return to full duty after all, or if the pain persisted, then Allen might require a repeat MRI to rule out an "underlying rotator cuff tear or pathology." So long as the rotator cuff would be intact as anticipated, "[Allen] would be a candidate for an arthroscopic [capsular] release in order to try to regain the motion, which he [] lost secondary to postoperative and inflammatory stiffness in the right shoulder." (Exh. 43; 1118).

As of August 26, 2009, all was well from an objective, mechanical standpoint with Allen's shoulder. Dr. Espinoza considered the shoulder to be stable even though Allen was continuing to experience pain. Dr. Espinoza had done all he could for Allen at that point in time yet Allen had measurable residual impairments post-surgery, and therefore a second surgery to relieve some of those limitations might be an option at a later date. Allen was released to work "full duty," but again restricted to "medium work (no lifting greater than 50#)." (Exh. 43; 1121). No follow-up visit was scheduled at that time.

Allen returned to Dr. Espinoza on November 18, 2009, complaining of increased soreness after routine work activities related to a shore wire. (Exh. 43; 1135). Dr. Espinoza was convinced that this soreness was not the result of a new injury but rather a product of the inflammatory stiffness that he had described in his note of August 26, 2009. Dr. Espinoza gave Allen a cortisone injection, prescribed an anti-inflammatory, and returned him to "full duty" once again.

Allen returned to Dr. Espinoza on December 4, 2009, for a repeat evaluation following the cortisone injection. (Exh. 43; 1139). Dr. Espinoza was pleased with the outcome as of that date and released Allen to full duty without any restrictions. Dr. Espinoza had no specific knowledge of what Allen's job required in terms of weight restriction.

Allen had no history of problems with his right shoulder prior to the November 30, 2008 incident. All of Allen's medical treatment, including the surgery on April 23, 2009, was necessitated by the November 30, 2008 incident.

Even though Dr. Espinoza discharged Allen without restrictions, Allen was in fact not able to work at his pre-November 30, 2008 level doing heavy manual labor. Allen continued to experience pain while doing routine work activities. Allen's right shoulder was weakened and susceptible to re-injury because of the trauma sustained on November 30, 2008, and the subsequent surgery. Allen relied on the deckhands that he supervised to do the heavy manual work that his position required.

On February 1, 2010, Allen settled his Jones Act claim with ARTCO. As part of the receipt and release agreement, Allen attested that he was physically capable of performing "the essential functions" of his position as a mate without any accommodations. (Exh. 41; 1000). The Court questioned Allen at trial as to why he would sign such a release if he was in fact continuing to experience pain. Allen candidly explained that he simply wanted to go back to work and he was concerned about losing his job if he continued to complain about the pain. Allen had been doing his job with accommodations and he had hoped to continue in that manner since no one at ARTCO had complained thus far.

Allen returned to Dr. Espinoza on February 19, 2010, complaining of right shoulder pain after working with shore wiring. (Exh. 43; 1157). Dr. Espinoza also noted an episode of Allen pulling himself up with his right arm, which caused a grabbing pain in the front of his shoulder. (*Id.*). This "pulling up" episode occurred when Allen's young grandson fell into a

10

ditch and Allen had to act quickly to pull him out. Dr. Espinoza explained that Allen's shoulder complaints on this day were similar to what he had reported before but this time the pain was less vague and diffused. Now the pain was more specific and focused along the front of the shoulder. This more focused pain could be an extension of Allen's previous injury, or an overuse injury, or an entirely new injury. Dr. Espinoza prescribed oral steroids and ordered an MRI.

The MRI was performed on March 1, 2010. (Exh. 43; 1164). The MRI revealed changes consistent with bursitis and a small partial tear of the rotator cuff. The bursitis could have possibly been related to the prior surgery but the tear was a new injury that had not appeared on the first MRI.

Based on the MRI and Allen's continuous complaints of pain that had not resolved with the first surgery, Dr. Espinoza performed a second surgery on March 15, 2010, the purpose of which was to remove any potential pain generating sources within Allen's shoulder. Diagnostic arthroscopy revealed a degenerative tear of the proximal biceps with an intact superior labral complex and some fraying of the biceps tendon. (Exh. 43; 1174). There was also some inflamed bursal tissue which was resected. (*Id.*).

Allen underwent follow-up physical therapy and went on disability. Dr. Espinoza released Allen to return to work effective July 5, 2010, but restricted to "Light Heavy Work: Lifting 75 pounds maximum with frequent lifting and/or carrying of objects up to 40 pounds." (Exh. 43; 1203). During the same follow-up office visit that Dr. Espinoza issued the return to work slip, Allen reported hurting his shoulder on June 26, 2010, when he slipped at home and nearly fell into a ditch. (*Id.* at 1209). Allen had extended his arms to prevent himself from falling. The doctor prescribed more pain medication and scheduled a follow-up visit in four weeks.

At the follow-up visit on July 30, 2010, the note reflects that Allen had tried to return

to work but he experienced pain while pulling on a wire. (Exh. 43; 1219). Allen continued on light duty through August 2010, and on August 30, 2010, Dr. Espinoza placed Allen on a permanent medium duty restriction. (*Id.* at 1229; 1231).

In October 2010, Allen underwent a Functional Capacity Evaluation to determine exactly what type of work that he could do. The evaluator concluded that Allen would be limited to medium duty work with restrictions and that he would not be able to return to safely work as a lead mate or to any other position on the river. (*Id.* at 1238). On October 22, 2010, Dr. Espinoza concurred with the FCE results and once again imposed permanent work restrictions. (*Id.* at 1248). According to the note, Allen told Dr. Espinoza that he had contacted a lawyer.

Allen filed suit against AEP and Nathan Kincaid on April 21, 2011.

Allen next saw Dr. Espinoza on June 23, 2011, the visit being required by the long term disability insurance carrier. (Exh. 43; 1254). Dr. Espinoza noted that Allen continued to suffer from residual stiffness and pain in his right shoulder. Dr. Espinoza confirmed that Allen would never be able to return to heavy-labor type activities, but that he could do light duty work, and this would be a permanent restriction. (*Id.*). The follow-up visits from that point forward are unremarkable. Allen's shoulder remained unchanged but with occasional flare-ups of pain.

On July 26, 2011, ARTCO informed Allen in writing that it had no open jobs to accommodate his restrictions. (Exh. 34).

Allen is now permanently, partially disabled due to limitations with his right shoulder. Although he leads an active life, Allen cannot return to the type of lucrative employment that he had prior to the November 30, 2008 incident.

The degenerative tear that Dr. Espinoza repaired as part of the second surgery on March 15, 2010, was not sustained during the November 30, 2008 incident. The tear was not

present on the original post-incident MRI or observed during the first surgery. Allen could have sustained the tear while working within the post-operative restrictions that Dr. Espinoza had imposed—such as swinging the maul, pulling on shore wire, or even painting—which would suggest that the shoulder was not nearly as stable as Dr. Espinoza had concluded. But the tear could also have been sustained as a result of non-work-related activities—such as when Allen pulled his grandson from the ditch—an activity that could possibly tear even a healthy shoulder. It is impossible to know what caused the tear that Dr. Espinoza repaired during the second surgery. The new tear was sustained after the first surgery but likely sometime prior to February 19, 2009, which is when Dr. Espinoza specifically noted that Allen's complaints of pain were now more focused along the front of the shoulder. It is clear that Allen's shoulder was more susceptible to injury after the November 30, 2008 incident and the first surgery, but is impossible to conclude with certainty that the tear was causally-related to the November 30, 2008 incident.

But the second surgery was necessitated at least in part by the original November 30, 2008 incident. At the visit of August 26, 2009, Dr. Espinoza had specifically noted the possibility of a second surgery to relieve Allen's continuing pain and stiffness, and to help Allen regain some motion and reduce his impairment. Besides repairing the new tear, Dr. Espinoza performed a bursectomy to relieve inflammation attributable to the first surgery and original injury.

Allen's permanent limitations, which preclude him from returning to his prior employment, are attributable to the November 30, 2008 incident. Allen had no problems with his right shoulder prior to the November 30, 2008 incident. The trauma that Allen sustained to his shoulder on November 30, 2008 necessitated the first surgery. As a result of the November 30, 2008 incident and the first surgery Allen's shoulder became more susceptible to injury. Allen was never able to return to his same level of manual labor after

the accident and the shoulder was repeatedly aggravated when Allen attempted to work within the restrictions that Dr. Espinoza prescribed for him. Allen's complaints of pain were persistent following the November 30, 2008 incident. No other intervening incident was demonstrated to have effected the same level of trauma to the shoulder that the November 30, 2008 incident inflicted. The Court is convinced that it was the original November 30, 2008 incident that disabled Allen.

The Court credits the testimony of Allen's vocational rehabilitation expert, Todd Capielano. Mr. Capielano concluded that Allen was capable of attaining employment that would pay about $12 per hour or $480 per week. Allen had been doing manual labor his whole life and even though he had a high school diploma he scored very poorly on his academic evaluation tests.

Margo Hoffman was AEP's vocational rehabilitation expert. Ms. Hoffman's conclusions regarding Allen's employability were implausible and highly speculative, particularly in light of Allen's significant academic deficiencies.

Allen sustained the following special damages as a result of the November 30, 2008 incident: past/future lost earnings of $426,866.00 and past medical of $45,058.00.

The Court awards Allen $150,000.00 in compensatory damages as a result of the November 30, 2008 incident.

## II.    CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333, which confers on the federal courts original jurisdiction over admiralty and maritime claims. Venue is proper in this district and is not contested. Allen was injured on navigable waters. Maritime law governs Allen's claims against AEP.

Under maritime law, there are four elements that the plaintiff must establish to succeed on a negligence theory: 1) that the defendant owed a duty, 2) that the defendant

breached that duty, 3) that the plaintiff sustained injury, and 4) that there is a causal connection between he defendant's conduct and the plaintiff's injury. *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010) (*quoting Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

Under maritime law a plaintiff is owed a duty of ordinary care under the circumstances. *Id.* (*citing Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)). The determination of the existence and the scope of duty "involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *Id.* (*quoting Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)).

Under the general maritime law an employer is vicariously liable for the torts of its employee committed in the course and scope of the employment. *Stoot v. D & D Catering Serv., Inc.*, 807 F.2d 1197, 1199 (5th Cir. 1987).

The duty of ordinary care that Kincaid owed to Allen included the obligation to refrain from releasing the pelican hook before warning Allen. Kincaid breached that duty and Allen was injured as a result. An injury of the type that Allen sustained was a foreseeable harm from prematurely releasing the pelican hook.

Notwithstanding the outstanding legal representation and thorough presentation of the defense by counsel for the defendant, this Court finds that the injuries that are the subject of this lawsuit were caused by Kincaid's breach. AEP is liable for the injuries that Allen sustained as a result of Kincaid's negligence.

Prejudgment interest is available in admiralty cases to compensate the plaintiff for the use of funds to which he was rightfully entitled. <u>Brister v. A.W.I., Inc.</u>, 946 F.2d 350, 362 (5th Cir. 1991) (<u>quoting</u> <u>Noritake Co. v. M/V HELLENIC CHAMPION</u>, 627 F.2d 724, 728 (5th Cir. 1980)). The purpose of prejudgment interest is to compensate the plaintiff for the use of funds to which he was rightfully denied. The award is subject to the trial court's sound

discretion.

In this case AEP learned of Allen's injury when he filed suit against the company and Nathan Kincaid on April 21, 2011. Prior to this date AEP had no knowledge that Allen would seek recovery from AEP for his damages. Allen is entitled to prejudgment interest at the rate of 2 percent per annum from the date of filing suit.

Post-judgment interest and costs are owed in accordance with the applicable statutes.

New Orleans, Louisiana, June 25, 2013.

_____
Judge Jay C. Zainey
United States District Judge